**UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO**

THE UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                     No. 1:18-cr-01828-JCH

SHAKEAM J. KINNEY, and
LALONZO J. SIMMONS,

    Defendants.

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Lalonzo J. Simmons' Motion to Suppress Tangible Evidence and Statements (ECF No. 63). The Court held a hearing on the motion on September 12, 2019. After carefully considering the motion, briefs, evidence, and being fully-informed, the Court concludes that Defendant's motion should be granted in part and denied in part.

**I.    FACTUAL BACKGROUND**

The Court makes the following findings of fact, as supported by the record, in accordance with Rule 12(d) of the Federal Rules of Criminal Procedure.

In March 2018, Defendants robbed a Subway restaurant in Albuquerque, New Mexico by gunpoint. *See* Motion Hearing Transcript 11:13-16 (Mot. Hr'g Tr.). Albuquerque Police Department Detective Tyler Burt reviewed the surveillance footage from inside the restaurant and observed Mr. Simmons' unconcealed face. *Id*. 10:20; 12:22-24. The robbers fired bullets in the restaurant, leaving behind casings which officers sent to the Bureau of Alcohol, Tobacco, Firearms

and Explosives (ATF) for testing. *Id*. 12:13-14, 15:9-12. Video footage captured the robbers fleeing in a Dodge Caravan with the license plate clearly visible. *Id*. 13:4-8.

Detective Burt traced the Dodge's license plate to a suspect who lived at the Continental Arms Apartments, an apartment complex in Southeast Albuquerque. *Id*. 15:19-21. Police surveilled the Dodge with a Global Position System tracker, but the surveillance generated no leads, and when Detective Burt looked at a photograph of the Dodge's owner from the Motor Vehicle Department database, he knew that the suspect was not one of the Subway robbers. *Id*. 16:17-19, 17:1-3. Police had a second suspect in mind, but as the investigation unfolded and a state judge denied a warrant for that suspect's arrest, police determined the second suspect also was not the involved in the Subway robbery. *Id*. 17:4-7, 17:23-23 – 18:1.

On April 3, 2018, two same-day armed robberies occurred. The first was of another Subway restaurant. *Id*. 18:4-5. The second was of a marijuana dispensary. *Id*. 18:25 – 19:1-2. Only one individual, believed to be Mr. Kinney based on officers' review of video footage, robbed the Subway restaurant that morning by gunpoint. *Id*. 18:7-8. Both Defendants robbed the marijuana dispensary later that day. *Id.* 50:25 – 51:1-6. Detective Burt's review of the video footage from the first Subway robbery on March 19, 2108 and the marijuana dispensary robbery showed that the taller suspect, believed to be Mr. Simmons, wielded the same distinctive firearm in each robbery. *Id*. 51:7-16.

A tannish silver Mercedes was used in the April 3 robberies, the license plate visible. *Id*. 18:9, 20:5-9. Detective Burt traced the vehicle's license plate to its registered owners, Mr. Simmons and Crystal Baca. *Id*. 11-12. The detective's search of the MVD database showed that Mr. Simmons was six-foot-five, African-American, and weighed 200-plus pounds, which is how the Subway employees from the first robbery described one of the robbers. *Id*. 18:11-12, 13:21-

22. The next day, on April 4th, officers obtained a warrant to place a GPS tracker on Mr. Simmons' and Ms. Baca's Mercedes. *Id*. 25:3; 52:7-9. Officers observed Mr. Simmons driving the sedan. *Id*. 75:9-12.

On April 9, 2018, ATF got back to Detective Burt about the two bullet casings from the first Subway restaurant robbery from March. *Id*. 22:10-14. The casings were connected to casings recovered from a shooting that happened across the street from the Continental Arms Apartments, the apartment complex where Mr. Kinney resided. *Id*. 22:15-25 – 23:1-22. This shooting occurred two-days after the first Subway robbery, or on March 21, 2018. *Id*. 22:13-14. When officers spoke to the apartment complex manager, she said that she saw Mr. Kinney entering the building after the shooting. *Id*. 23:2-11.

On April 10, Detective Burt learned that a "source of information" told an ATF agent that Mr. Simmons was involved in some robberies and gave the agent Mr. Simmons' phone number, which turned out to be the same phone number Mr. Simmons' gave in a post-arrest interview. *Id*. 52:17-25 – 53:1, 53:18-24. During this same period, Detective Stone, whom the Court finds credible based on his officer training and experience, observed Mr. Simmons engage in activity consistent with counter-surveillance, such as drive different routes to and from home and do loops in the neighborhood before pulling into his driveway. *Id*. 77:24-25 – 78:1-10.

On May 1, 2018, at about ten o'clock in the morning, Defendants were allegedly seen on video robbing another marijuana dispensary by gunpoint. *Id*. 26:17-18, 23, 27:10-12. Footage captured Mr. Kinney entering the dispensary with his face uncovered, firing a round into the ceiling, and robbing cash and merchandise. *Id*. 26:24-25, 27:9-12. Mr. Simmons was filmed standing guard in the doorway. *Id*. 27:13-16. The men fled in a stolen getaway truck that was found abandoned. *Id*. 27:22-25, 30:1. The GPS tracker on Mr. Simmons' Mercedes revealed that the

Mercedes left Mr. Simmons' residence, and then traveled to the same location where the truck was found abandoned, suggesting that someone driving Mr. Simmons' car retrieved Defendants from the getaway truck. *Id*. 30:21-25 – 31:1-3. When Detective Burt shared the video footage of the robbery with Detective Church, Detective Church identified Defendants as the robbers based on his weeks-long surveillance of the Defendants. *Id.* 97:1-6. Surveillance teams observed both men at their respective residences while Detective Burt began drafting warrants for the Defendants' arrest and search of their residences. *Id*. 31:24-25 – 32:1-5. Detective Burt knew that Mr. Simmons had a criminal record for aggravated battery, armed robbery, aggravated burglary and false imprisonment. *Id*. 34:7-15.

As Detective Burt prepared the warrants, APD detectives coordinated with other law enforcement units to arrest the Defendants simultaneously. Meanwhile, though, Detective Church covertly watched Mr. Kinney behaving "erratic[ally]." *Id*. 100:9. He would dart in and out of his apartment, look up and down the street, stare down passing cars and pedestrians, and talk on a two-way radio. *Id*. 100:11-25. He held a black drawstring bag, hand inside the bag, making Detective Church fearful that he was hiding a gun. *Id*. 101:10-14. When another surveilling officer had to move his car from the street to an alleyway, Mr. Kinney followed the car into the alleyway. *Id*. 101:15-19.

Police manpower was split into two, half of the team was at Mr. Simmons' residence, half at Mr. Kinney's. *Id*. 102:24-25 – 103:1. Detective Church called Detective Burt several times asking about the status of the warrants. *Id*. 103:3-7. Detective Church testified that because of Mr. Kinney's behavior and Defendants' use of firearms in the April 3 and May 1 robberies, he and his sergeant decided to simultaneously arrest the Defendants before Detective Burt completed the warrant process. *Id*. Detective Church believed that simultaneous arrests minimized the risk of Mr.

4

Simmons' learning of Mr. Kinney's arrest and then fleeing or destroying evidence. *Id*. 105:4-7. SWAT, bomb squad, and K-9 officers told Mr. Kinney over a PA system to give himself up. *Id*. 108:13-13. He exited his apartment and was detained. *Id*. 108-13-15. Officers entered the apartment and conducted a protective sweep to look for occupants. *Id*. 108:23-25 – 109:1-6.

Officers detained Mr. Simmons using the same tactics, although with a smaller law enforcement contingent of ten to 12 officers. *Id*. 105:13-17, 108:15-18, 137:4-7. Officers knew that other occupants were inside the house with Mr. Simmons, but they were unsure how many. *Id*. 146:1-5. They used a spike belt on in case Mr. Simmons attempted to flee in his parked vehicle. *Id*. 127:13-16. After a series of announcements, his partner Crystal Baca also exited and was taken into custody. *Id.* 139:19-22. No evidence was seized by officers during the protective sweep of Mr. Simmons' residence, although officers did see a rifle in a crawl space. *Id*. 130:3-19. Detective Burt did not know about or rely upon the existence of the rifle when he drafted the search warrants. *Id*. 130:20-25 – 131:1-3.

Around this time, Detective Burt had received word that Defendants were arrested, so he stopped working on arrest warrants but continued drafting warrants to search the Defendants' homes. *Id*. 34:1-4, 35:4-10. At 7:50 P.M. that same evening, a state judge signed the search warrant to search Mr. Simmons' home based on Detective Burt's affidavit. As noted earlier, the detective did not know of any evidentiary content within the home when he drafted the warrants. *Id*. 38:25 – 39:1. Officers found the evidence at issue while executing the search warrant. According to the search warrant return, officers found a rifle, ammunition, marijuana, and marijuana products. *See* Govt.'s Ex. 1.

Mr. Simmons and Ms. Baca were taken to a police station. Mot. Hr'g Tr. 39:12-14. Before *Mirandizing* Mr. Simmons, Detective Burt asked Mr. Simmons booking information, including

his name, birthdate, social security number, phone number, and "that sort of stuff" *Id*. 40:11-19. The detective read Mr. Simmons his *Miranda* rights, which he waived. *Id*. 39:21-24. [1]

**II. FOURTH AMENDMENT OVERVIEW**

The Fourth Amendment provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause ...." U.S. Const. amend. IV. "[T]here are 'strict limits' on when law enforcement officers may reasonably (and thus lawfully) enter a home without a warrant." *United States v. Martin*, 613 F.3d 1295, 1299 (10th Cir. 2010). In *Payton v. New York*, 445 U.S. 573, 576 (1980), the Supreme Court held that, absent exigent circumstances, police officers may not enter an individual's home to make a nonconsensual warrantless seizure, even with probable cause. "In terms that apply equally to [searches for] property and seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonable be crossed without a warrant." *Id*. at 590.

The Tenth Circuit has held that "officers need not physically enter the home for *Payton* to apply." *United States v. Reeves*, 524 F.3d 1161, 1165 (10th Cir. 2008). "*Payton* is violated where there is such a show of force that a defendant comes out of a home under coercion and submits to being taken into custody … it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home." *United States v. Maez*, 872 F.2d 1444,

---

[1] In his motion to suppress Mr. Simmons says that officers asked Ms. Baca if her son was a rapper and if his music was any good. She responded that she would rather her son work at Costco. Officers then asked Mr. Simmons if "had any idea as to why he was here." After Mr. Simmons gave an unsatisfactory response, officers gave Mr. Simmons and Ms. Baca *Miranda* warnings. In its response brief, the Government informs the Court that Ms. Baca's statement in response to the question concerning her son and Mr. Simmons' statement in response to the question of whether he had any idea why he was at the jailhouse should be suppressed. Noting the parties' agreement on the issue, the Court suppresses the particular statements identified in this footnote.

1451 (10th Cir. 1989).[2] Law enforcement officers must obtain a warrant to arrest a criminal suspect inside his residence "unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search [or seizure] is objectively reasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). "[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984). "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *United States v. Davis*, 290 F.3d 1239, 1242 (10th Cir. 2002) (quoting *Kyllo v. United States,* 533 U.S. 27, 31 (2001)).

      Here, the Government seeks to justify the warrantless arrest of Mr. Simmons based on the risk of danger to police officers or other people inside or outside their residences, which is a recognized exigent circumstance justifying a warrantless seizure. *See United States v. Thomas*, 372 F.3d 1173, 1177 (10th Cir. 2004); *United States v. Gay*, 240 F.3d 1222, 1228 (10th Cir. 2001) ("[e]xigent circumstances exist when officers are presented with an emergency situation, including threat of physical violence."). For the Government to rely successfully upon that exception to the Fourth Amendment's warrant requirement, the Government "must show that there was a risk of serious physical injury posed to the officers or others that required swift action." *Cortez v. McCauley*, 478 F.3d 1108, 1124 (10th Cir. 2007) (en banc). "Officers do not need probable cause if they face exigent circumstances in an emergency." *United States v. Gordon*, 741 F.3d 64, 70 (10th Cir. 2014). "[T]o demonstrate that officer safety concerns qualify as exigent circumstances permitting entry into a home without a warrant, the government must show "(1) the officers had

---

[2] The Government concedes that officers seized Defendants when "a large number of uniformed officers, utilizing a large array of force, including K-9s, firearms, and other protective measures, verbally ordered" the Defendants to exit their individual residences.

7

an objectively reasonable basis to believe that there was an immediate need to enter to protect the safety of themselves ... and (2) the conduct of the entry was reasonable." *Martin*, 613 F.3d at 1303.

In its response brief, the Government claims that the following facts justified officers' warrantless arrest of Defendants: (1) they were suspects in the violent armed robberies of the Subway restaurants and marijuana dispensary robberies over a six-week period; (2) officers knew they had felony convictions involving firearms; (3) defendants engaged in counter-surveillance, indicating they were aware of police presence; (4) hours earlier, Defendants robbed the second marijuana dispensary and presumably were armed and dangerous.

**III. DISCUSSION**[3]

**A. Did Exigent Circumstances Justify the Warrantless Entry into Mr. Simmons' Residence?**

Exigent circumstances did not justify the warrantless entry of Mr. Simmons' residence. In *Minnesota v. Olson*, 495 U.S. 91 (1990), exigent circumstances did not justify officers' warrantless entry into a residence where the driver of a getaway car, who had fled the scene of an armed robbery and murder, was inside the home with two individuals "with no suggestion of danger" to those individuals. The Supreme Court explained that "[t]hree or four … police squads surrounded the house. The time was 3 p.m., Sunday.... It was evident the suspect was going nowhere. If he came out of the house he would have been promptly apprehended." *Id*.

Much the same is true here. The Government acknowledges that "a large number of uniformed officers, utilizing a large array of force" ordered Mr. Simmons from his residence. They

---

[3] In his motion to suppress, Mr. Simmons twice mentions the Sixth Amendment of the United States Constitution as a basis for suppressing incriminating evidence. *See* Def.'s Mot. at 1, 13. However, beyond these two references to that Amendment, Mr. Simmons provides no Sixth Amendment legal analysis. Accordingly, the Court will limit its analysis to Mr. Simmons' arguments under the Fourth and Fifth Amendments.

"covered all exits," the Government says, placed a spike strip on the roadway near his home, and for all purposes dominated the scene. The evidentiary record shows that officers' tactics were carefully planned-out and formulated – not that they were responding to an emergency situation that arose on the scene, which is the justification for the exigent circumstances exception to the warrant requirement. There is no evidence that immediately before the arrest Mr. Simmons made threatening movements, statements, or the like, that would have suggested an immediate threat requiring swift action. No victims were within Mr. Simmons' apartment requiring immediate aid. The Court recognizes that a defendant's violent history may properly be considered when determining whether exigent circumstances exited. *See United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006) (citing *United States v. King*, 222 F.3d 1280, 1285 (10th Cir. 2000). However, if exigent circumstances did not exist for the armed robbery and murder suspect in *Olson* because he presented no danger to the individuals inside the residence and the overwhelming police presence made it clear he "was going nowhere," then exigent circumstances did not justify Mr. Simmons' warrantless arrest by a contingent of ten to twelve officers.

At the suppression hearing, Detective Church testified that Mr. Kinney's increasingly erratic behavior influenced his decision to immediately arrest Mr. Kinney without waiting for a warrant. He and his sergeant believed that arresting Mr. Simmons at the same time would prevent Mr. Simmons learning of his co-offender's arrest and then fleeing the scene or destroying evidence.

The problem is that the Government does not cite, and the Court has not found, caselaw permitting a warrantless arrest of one co-offender based on the erratic behavior of his non-present co-offender. The two cases that the Government does rely upon do not support its "partner in crime" theory that Mr. Kinney's erratic behavior justified Mr. Simmons' warrantless arrest. In

*United States v. Thomas,* 372 F.3d 1173, 1175 (10th Cir. 2004) an officer investigated louds shouts from an apartment complex, including "go ahead and kill me" and "you better put that gun away," and a woman screaming and running. After ordering six or seven people to exit an apartment – including the defendant who earlier brandished a gun and then stashed it in the apartment – the officer searched the apartment for potential injured victims. *Id*. at 1175-76. The Tenth Circuit upheld the warrantless entry, holding that police had an "immediate need" to ensure their safety and that of others because officers had just broken up a heated argument involving a gun and officers did not know if anyone else in the apartment had access to firearms. at 1177-78. *Thomas* provides no support for the Government's theory. That case did not involve warrantlessly arresting one suspect based on his non-present co-offender's behavior.

The same is true with the second case the Government relies on, *United States v. Walker*, 474 F.3d 1249, 1253 (10th Cir. 2007). There, the officer knocked on the defendant's door and announced he was from the sheriff's office, to which the defendant responded, "Yeah, and I got a goddamn gun." *Id.* at 1251. Hearing this, officers immediately entered the defendant's house and told the defendant to put his hands up. *Id*. The Tenth Circuit applied the exigent circumstances exception to the officer's warrantless entry, reasoning that the defendant's "threatening remark justified the officers in taking prompt action to protect themselves." *Id*. at 1253. *Walker* likewise did not involve the arrest of co-offenders at their separate residences.

Instead, these cases illustrate the critical fact – absent here – that a warrantless arrest is justified by an *immediate* need for law enforcement officers to act. Applying *Olson*, officers violated Mr. Simmons' right to free from an unreasonable seizure when they warrantlessly arrested him without exigent circumstances.

**B. Despite a Fourth Amendment Violation, Would the Evidence at Mr. Simmons' Residence Have Been Inevitably Discovered?**

"When a search violates the Fourth Amendment, the exclusionary rule normally dictates that evidence obtained as a result of that search be suppressed." *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005). "In addition, a defendant may also suppress any other evidence deemed to be 'fruit of the poisonous tree,' (*i.e.,* evidence discovered as a direct result of the unlawful activity), by showing the requisite factual nexus between the illegality and the challenged evidence." *United States v. Olivares-Rangel*, 458 F.3d 1104, 1108–09 (10th Cir. 2006).

In its response brief, the Government argues that the incriminating evidence against Defendant would have been inevitably discovered because a warrant would have been obtained. *Nix v. Williams,* 467 U.S. 431 (1984), establishes that the inevitability of discovering certain evidence through lawful means removes the taint from that evidence even though it was originally discovered by unlawful means. "The inevitable discovery doctrine provides an exception to the exclusionary rule, and permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it." *Cunningham*, 413 F.3d at 1203. "The government has the burden of proving by a preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation." *United States v. Souza*, 223 F.3d 1197, 1203 (10th Cir. 2000).

"Where the theory of inevitable discovery is that a warrant would have been obtained but for the illegal search, the district court must determine how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant." *United States v. Christy*, 739 F.3d 534, 541 (10th Cir. 2014) (citation and quotation marks omitted). The Tenth Circuit uses four factors to aid in this determination:

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement

> agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

*Id.* (citation omitted). Mr. Simmons does not dispute the third factor. *See* Def.'s Mot. at 7. Therefore, the Court limits its analysis to factors 1, 2, and 4. An analysis of those three components shows that they all weigh firmly in the Government's favor.

The first factor examines what steps law enforcement officers took to obtain a warrant before the search. *See Christy*, 739 F.3d at 542. The warrant process was actively underway while Defendants were arrested, although Detective Burt eventually stopped working on the arrest warrants when he learned that Defendants were taken into custody. Within a short time after his arrest, a state judge signed-off on the search warrant for Mr. Simmons' residence. Officers conducted a protective sweep of Mr. Simmons' residence immediately after arresting him, but no after-the-fact information or evidence from that sweep was included in the search warrant affidavit or seized. Rather, officers immediately sealed off the residence, waited for the search warrant, and then executed a full search of Mr. Simmons' residences. This factor firmly weighs in the Government's favor.

Turning to the second factor, the evidence in Mr. Simmons' residence would have been inevitably discovered because officers had probable cause to think he and Mr. Kinney were the assailants in the robberies. "Probable cause to arrest exists where, under the totality of the circumstances, a reasonable person would believe that an offense has been ... committed by the person arrested." *Martin*, 613 F.3d at 1302. The affiant officer, Detective Burt, was the primary investigator on the case. His investigation spanned weeks, included interviews with the robbery victims, and watching video footage from the robberies. As a result of the weeks-long surveillance and investigation of Defendants, officers identified them as primary suspects. That identification was confirmed by the fact that on the May 1 robbery, both Defendants were shown on camera

robbing the dispensary with their faces uncovered. These facts amply show that probable cause was strong. *See Martin*, 613 F.3d at 1302 (finding probable cause in similar circumstances to arrest a shooting suspect who was reported to have fled with weapons used in the shooting hours earlier and who matched a description of the assailant.).

As to the fourth factor, there is no evidence that officers "jumped the gun" because they lacked probable cause. *Christy*, 739 F.3d at 542. In fact, the record shows the opposite. Officers forced entry because they wanted to make simultaneous arrests. As noted earlier, while waiting for the warrants, officers took measures to secure Mr. Simmons' residence, but they did not conduct any additional searches until the warrant was in hand. Ample probable cause supported the issuance of the warrant to search Mr. Simmons' home. The Government has carried its burden of proving by a preponderance of the evidence that the evidence from Mr. Simmons' residence would have been inevitably discovered without the Fourth Amendment violation.

### C. Is Mr. Simmons Entitled to Suppression of Pre-*Miranda* Statements?[4]

The Fifth Amendment guarantees that "no person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. Under *Miranda v. Arizona,* "the government may not use any statements stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). A court examines all the circumstances surrounding

---

[4] The Court is unsure if Mr. Simmons seeks suppression of his post-arrest statements. At the suppression hearing, Mr. Simmons said that he "[did not] challenge the statements that were given after the *Miranda* rights." Mot. Hr'g Tr. 40:6-7. However, in one sentence of his motion, Mr. Simmons stated that "[w]ithout probable cause, the government is also precluded from positioning a potential defense to the suppression of the post-arrest statements." Def.'s Mot. at 9. If Mr. Simmons has moved to suppress his post-arrest jailhouse statements as a result of the *Payton* violation, his motion is denied. *See New York v. Harris*, 495 U.S. 14, 21 (1990) (holding that the exclusionary rule does not apply to statements made by a defendant while in custody if police had probable cause to arrest him, even if the arrest itself violated *Payton*.)

13

a potential interrogation to determine whether the suspect was in custody, and considers whether a reasonable person in that situation would have felt that he or she could end the interrogation and leave. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995). For *Miranda* purposes, an interrogation includes express questioning as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).

According to Mr. Simmons, before he and Ms. Baca were *Mirandized* officers asked Mr. Simmons booking information, including his name, birthdate, age social security number, phone number, place of birth, employment status, address, and names of other household members. After asking if "had any idea as to why he was here," officers then administered *Miranda* warnings to Mr. Simmons and Ms. Baca. They waived their *Miranda* rights and supposedly gave lengthy statements.

Mr. Simmons contends that providing identifying information such as his address and information about household members could be incriminating and that absent *Miranda* warnings this information must be suppressed. However, there is no record evidence that Detective Burt did ask Mr. Simmons about his household members. *See* Mot. Hr'g Tr. 40:17-19 (Detective Burt stating that he asked Mr. Simmons "any information for, like, report purposes, like name, date of birth, social, address, phone number, that sort of stuff."). The questions that Detective Burt did pose to Mr. Simmons "fall within a routine booking question exception which exempts from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990).

14

**IT IS THEREFORE ORDERED that** Defendant Lalonzo Simmons' Motion to Suppress Tangible Evidence and Statements **(ECF No. 63)** is **GRANTED** to the extent that it seeks suppression of Crystal Baca's statement in response to the question concerning her son and Mr. Simmons' statement in response to police questioning of whether he had any idea why he was at the jailhouse; in all other respects, Mr. Simmons' motion is **DENIED**.

**IT IS SO ORDERED**.

THE HONORABLE JUDITH HERRERA
Senior United States District Judge